Filed 3/9/22  In re A.S. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re A.S., a Person Coming Under the Juvenile Court Law. | B311634 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK22883A) |
| Plaintiff and Respondent, | |
| v. | |
| H.W., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Martha A. Matthews, Judge.  Affirmed.

Janelle B. Price, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Principal Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

H.W. (father) appeals from the denial of his Welfare and Institutions Code section 388[1] petition, filed on the eve of the permanency planning hearing, and from the termination of his parental rights.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.S. came to the attention of the Los Angeles County Department of Children and Family Services (Department) in May 2017 when she was less than a week old.  The Department filed a petition against A.S.'s mother and her male companion, who was deemed the alleged father, pursuant to section 300, subdivisions (a), (b) and (j) based on allegations of domestic violence and substance abuse.  During the Department's investigation, it was determined mother and alleged father had violent altercations and mother regularly used methamphetamines during her pregnancy.  (Mother and alleged father are not parties to this appeal.)

A.S. was placed in the care of foster parents, Mr. and Mrs. G.

Father contacted the Department and reported he believed he was A.S.'s biological father.  In July 2017, DNA testing requested by father established his paternity.  Father agreed to a home assessment by the Department and to attend a parenting class.  A month later, the court sustained the petition as to mother and alleged father, denied reunification services to both of them, found father to be the presumed father and placed A.S. in his home with family maintenance services.

---

[1]    All further undesignated section references are to the Welfare and Institutions Code, unless otherwise noted.

2

Shortly thereafter, father obtained permission to take A.S. on a two-week vacation to visit family in South Carolina. The agreed-upon return date was September 10, 2017. Father did not return as agreed. Once the Department was able to reach father by telephone, he explained that a hurricane was causing problems with his ability to travel home by bus. A Department social worker flew to South Carolina to meet with father and see how A.S. was doing. The social worker provided father with supplies, including diapers and formula. A.S. appeared to be fine and bonding with father. Father said he would likely return to California after his birthday in early October.

By November 2017, father still had not returned to California with A.S. and it was increasingly difficult to reach him by phone or e-mail. The social worker returned to South Carolina, met with father and found A.S. to have a cold. She advised father A.S. needed to see a doctor for her cold and her six-month immunizations. Father again said he planned to return to California soon, but he failed to do so.

On November 14, 2017, the Department filed the first of four petitions stating allegations against father. The petition, filed pursuant to section 342, alleged father had failed to enroll in or complete a parenting class, failed to keep in contact with the Department and failed to return A.S. to California. The court issued a protective custody warrant for A.S. With the assistance of local law enforcement in South Carolina, the Department regained custody of A.S. without incident and the protective custody warrant was recalled.

A.S. was returned to the foster home of Mr. and Mrs. G, who reported being "grateful" the child could be returned to their

3

care and that they remained willing to facilitate visitation with father and eventual reunification.

The contested adjudication hearing was continued to March 2018. Father contacted the Department in late February and reported he was back in California but was now homeless. The Department was unsure whether father had in fact returned to California. The Department advised the court father was not responding to its efforts to keep in contact and schedule visitation with A.S.

In March 2018, the court, in father's absence, sustained the section 342 petition, ordered reunification services for father and monitored visitation with A.S.

According to a September 2018 status report, A.S. was doing well in the home of Mr. and Mrs. G, who were "lovingly" attentive to her needs. A.S. also appeared happy in the company of her foster siblings. During this time, Dr. Lyn Laboriel diagnosed A.S. with partial fetal alcohol syndrome (FAS), microcephaly and some developmental delays. Dr. Laboriel told the social worker that A.S. would need lifelong care and needed to be placed with "somebody who can understand her slow pace, provide structure, consistency and a stable home environment." Dr. Laboriel said the foster parents were doing "extremely well" in that capacity. Mr. and Mrs. G remained committed to providing A.S. the care she needed.

The Department also learned that despite father's earlier claims, he did not return to California until April 2018. Father's return home was delayed in part because he was arrested for an altercation with his brother that resulted in him serving time in jail. However, since his return, father was staying in contact with the Department. Because of father's absence from A.S.'s life

for about six months, father's visits with A.S. were difficult. A.S. was having trouble bonding with father and usually cried in his presence and resisted being held by him.

Several months later, the Department reported father was attending a class for parents with children suffering from FAS and was attempting to understand A.S.'s diagnosis and resulting special needs. Father called A.S. his "angel." He had obtained housing (a studio apartment) and was acquiring the necessary items to make the home a safe environment for A.S. Father was still attempting to form a bond with A.S. during monitored visits. The bonding process was complicated by the fact father often missed or canceled visits. The approved monitor for the visits reported A.S. often reacted negatively when she saw father. In contrast, the social worker reported that A.S. remained strongly bonded to her foster parents and siblings.

At the review hearing in January 2019, the court ordered six more months of services for father and continued monitored visitation with A.S. but granted discretion to the Department to liberalize father's visits to unmonitored.

In April 2019, just before the 18–month review hearing, the Department filed its second petition against father pursuant to section 342 based on a domestic violence incident between father and his female companion, L.P. L.P. filed a domestic violence complaint with the police, stating she and father had argued and that father later had pushed his way into her apartment, pushed her down on the bed, forcibly kept her there for about 30 minutes and threatened to kill both her and himself. During the Department's investigation of the circumstances, L.P. changed her story, claiming it was just a misunderstanding, and the problems she was having were not with father but with a former

5

boyfriend.  The Department's investigation also revealed prior incidents of domestic violence with A.S.'s mother and another former girlfriend.

In August 2019, the Department reported it was unable to locate father's girlfriend to be available for the adjudication hearing on the domestic violence allegations.  The Department therefore withdrew the petition and asked the court to proceed with a contested review hearing on the original petition.

The Department reported that due to continued "inconsistencies" with father's visitation, A.S. still had not formed a strong, close bond with father.  Father had "some periods of regular visitation" but was otherwise inconsistent and unreliable.  The Department also expressed its concern that father continued to minimize A.S.'s emotional and developmental needs and had failed to demonstrate an ability to provide her with the support and guidance she needed.  Mr. and Mrs. G reported that after visits with father, A.S. was "very clingy" and her sleep patterns were disrupted, but she usually returned to her normal behaviors within one to two days.

Dr. Laboriel, A.S.'s doctor, continued to express concern over father's unwillingness to accept A.S.'s diagnosis.  Father regularly said A.S. was " 'fine' " and did not have special needs.  The doctor cautioned that if father reunified with A.S. and did not follow through with her services and therapy, she could experience developmental declines very quickly.

The social worker described father as showing genuine love and affection for A.S. but often having difficulty in guiding her behaviors and being a consistent, reliable adult in her life.  The Department acknowledged father had nonetheless made progress, had followed through with taking the parenting class

and had maintained stable housing and a job. The Department remained "apprehensive" about returning A.S. to father's care because of his unreliability, his tendency to be "easily agitated" and resolve problems with aggression, and his inability to accept responsibility for his own actions. The Department recommended termination of father's reunification services.

The court continued the contested review hearing on the original petition to September 2019 and then again to November 2019. At both hearings, the court granted father extended visitation with A.S., including overnights, weekends and then a 50/50 split with the foster parents in an effort to facilitate father's bonding with the child.

On November 4, 2019, the court found that father's progress had been substantial and released A.S. to father with family maintenance services.

On April 28, 2020, the Department filed a third petition pursuant to section 342 against father arising from allegations of a new incident of domestic violence by father with another female companion, M.M. The Department also filed a supplemental petition pursuant to section 387 alleging father had repeatedly failed to comply with the court's order to complete drug and alcohol testing.

On May 1, 2020, the court removed A.S. from father's care. A.S. was returned to the home of Mr. and Mrs. G.

According to the Department's investigation of the latest domestic violence allegations, M.M. told police father became aggressive during a verbal argument, threw papers at her face, grabbed her by her shirt collar and pressed his fists into her jaw and face. She said father had been aggressive with her once before. She requested an emergency protective order because she

feared father would retaliate against her for reporting him to the police.

M.M. told the social worker that father "constantly" put A.S. "in the middle of their arguments" and she did not think that was appropriate for the child. She said shortly after father had regained custody of A.S., he left her apartment after an argument, leaving A.S. with her for over a week without contact. M.M. also said that if she told father to leave her apartment because he was acting volatile, he would tell A.S. something like, "she's kicking us out, treating us like dogs." A.S. often cried in those circumstances. M.M. told father he needed to take a domestic violence class and learn to control his anger, and he said he would but did not want the Department to know about it. M.M.'s children from another relationship also reported to the social worker that father argued often with their mother.

In the jurisdiction and disposition report, the Department reported that father's visitation with A.S. remained "sporadic." Because of the COVID–19 pandemic, the visits were virtual. Father said reception was not good in downtown Los Angeles which made the virtual visits difficult. Mrs. G reported the quality of the visits was "poor" because father failed to engage with A.S. Mrs. G said they remained committed to adoption or legal guardianship of A.S. if father was unable to reunify. The Department recommended that father be allowed continued monitored visitation with A.S. but not offered further reunification services as he had already exceeded the period allowed by statute. (§ 361.5, subd. (a).)

At the hearing on August 13, 2020, the court amended the section 342 petition by interlineation, sustaining the allegations of domestic violence at paragraphs (a)(2) and (b)(1)–(3). The

court dismissed without prejudice the section 387 petition. A contested disposition hearing was set for September 11, 2020.

In the period leading up to the disposition hearing, father's visitation continued to be problematic, as he often canceled or cut visits short.

On September 11, 2020, the court terminated reunification services for father because he had exceeded the time allowed for reunification and set the section 366.26 hearing. Father filed notice of intent to challenge the court's setting of the permanency planning hearing but did not follow through with the filing of a writ. This court dismissed the writ, deeming it nonoperative (case No. B307781).

In the section 366.26 report, the Department stated father's visitation with A.S. remained sporadic. Father lost his temper with the monitor during a virtual visit on November 2, 2020, and A.S. told father he was being "scary." Father appeared to get "very upset" and even though A.S. said she wanted to play a game with father, he disconnected the call. The social worker reported that A.S. was strongly bonded to her foster family.

According to an addendum report in March 2021, A.S. was "thriving and doing well in the home" of the prospective adoptive parents. Mrs. G told the social worker she loved A.S. "very much" and only wanted the best for her. A home study had been approved. It was reported that father had gotten sick with COVID-19 and had therefore missed visits. After father reported he was better, the Department offered to assist in arranging makeup visits but father never followed up. Father sent an e-mail in February 2021, claiming the reason he missed visits was because he was not being forwarded the Zoom links. The

Department reported that Mr. G had passed away but that Mrs. G remained committed to adoption.

On April 8, 2021, father filed a section 388 petition requesting the court modify its order of September 11, 2020, and reopen reunification for another six months of services so that he could reunify with A.S. Father said he had been making progress in anger management and domestic violence classes and wanted time to complete those classes. The petition included attached letters indicating father had attended five sessions of a domestic violence course and three sessions of an anger management course and had begun individual mental health therapy once a month.

The next day, the permanency planning hearing was held. After entertaining argument, the court denied father's section 388 petition without an evidentiary hearing, reasoning father had not shown it was in A.S.'s best interest to reopen the reunification period. The court then heard argument on terminating parental rights. The court found the parental-benefit exception to adoption did not apply because father had not shown the benefits of maintaining his relationship with A.S. outweighed the benefits she would obtain from a permanent plan of adoption. The court terminated parental rights.

This appeal followed.

## DISCUSSION

### 1.	Father's Section 388 Motion

Father's section 388 petition was filed on the eve of the section 366.26 hearing and some six months after reunification services had been terminated. Father requested six more months of reunification services so he could complete anger management and domestic violence programs he had recently started in order

10

to regain custody of A.S.  Father contends the court abused its discretion in denying his petition without a hearing and holding him to a higher standard than is required by a prima facie showing of changed circumstances.

"We review the juvenile court's summary denial of a section 388 petition for abuse of discretion."  (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)  We find no abuse.

The allegations of a section 388 petition are to be liberally construed, but a parent filing such a petition must nevertheless establish, by a preponderance of the evidence, both changed circumstances and that the requested change would promote the best interests of the child.  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)  If the parent fails to show these two elements, the court need not conduct a hearing on the petition.  (*Ibid.* ["prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition"].)

Because of the late stage of the proceedings, father's prima facie burden was necessarily difficult.  Where, as here, reunification services have been terminated, "a parent's interest in the care, custody and companionship of the child is no longer paramount.  [Citation.]  Rather, at this point, the focus shifts to the needs of the child for permanency and stability.  [Citation.]  In fact, there is a rebuttable presumption that continued foster care is in the best interest of the child [citation]; such presumption obviously applies with even greater strength when the permanent plan is adoption rather than foster care.  A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, what is in the best interest of

11

the child." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464; accord, *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

We are not persuaded the court held father to an improper higher standard. The court properly viewed the circumstances from the perspective of the late stage of the proceedings. Moreover, the comments by the court in denying father's petition do not show it applied the wrong standards. The court said, "I do understand that a prim[a] facie showing is a low bar. The thing is that it's not zero. There just—under the facts of this case, there is just no conceivable way that father could show that given all of the things that have happened in the past that it would be in this child's best interest to reopen reunification again."

The record supports the juvenile court's exercise of discretion in denying the petition. Father says there was evidence of an "enduring" bond between him and A.S. and a potential for reunification. It is true that in the summer of 2017, while father was nonoffending and A.S. was an infant, the social worker reported that father acted lovingly toward A.S. and they appeared bonded. A.S. was then placed in father's custody. But, after father failed to timely return home with A.S. from South Carolina, he had difficulties making A.S. his priority and maintaining regular visitation. He went over six months without visiting A.S., and his efforts to rebuild their initial bond were fraught. The Department and the court acknowledged father's love for A.S. appeared to be genuine but that he nevertheless had difficulty making her a priority which impacted the nature of their relationship as she continued to mature into a toddler. Father had occasional periods of regular visitation but overall was inconsistent, canceling visits, and showing up late. The

12

foster mother reported A.S. experienced difficulties, including increased tantrums, related to father's visitation.

The record does not support father's assertion he was the most significant parental figure in A.S.'s life and therefore it was in her best interest to reunify with him. The record establishes that Mr. and Mrs. G had been the most significant parental figures. With the exception of a few months, A.S. had been in their care for most of her life and she was strongly bonded to them and their other children.

As father acknowledges, "[i]n determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) The juvenile court here had been involved with the case since its inception in May 2017, when A.S. was just a few days old. The court was fully aware of father's efforts over an extended period to reunify with his daughter and his failure to do so. The court acted well within its discretion in concluding father had not shown his requested modification on the eve of the permanency planning hearing was in A.S.'s best interest.

To the extent father appears to challenge the court's orders issued on September 11, 2020, when the section 366.26 hearing was set, those arguments are not cognizable on appeal. (*In re Anthony B.* (1999) 72 Cal.App.4th 1017, 1022–1023.) As father concedes, he did not pursue a writ of those rulings as required by statute. (§ 366.26, subd. (*l*).)

## 2. Termination of Parental Rights

Father contends the juvenile court abused its discretion in concluding the parental-benefit exception to adoption did not apply. We disagree.

13

Where, as here, "a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception. What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*); see also § 366.26, subd. (c)(1)(B).) If the parent demonstrates these three things, the parental-benefit exception to adoption applies and the juvenile court should not terminate parental rights but "should select a permanent plan other than adoption." (*Caden C.*, at pp. 636–637.)

Father contends the court found he had demonstrated the first two elements. While the minute order from the section 366.26 hearing states otherwise, the transcript of the hearing does reflect the following statement by the court, "although the father has maintained regular visitation with the child and has established a bond with the child, the court finds that the benefit accruing to the child from the relationship with her father is outweighed by the physical and emotional benefit the child will receive through the permanency and stability of adoption."

In concluding father had not established the parental-benefit exception to adoption, the court's focus was almost entirely on the third element of the exception—whether termination of the parental relationship would be detrimental to the child.

14

In resolving whether the parent has established this third element, the court necessarily makes a series of factual determinations. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) But "the court must also engage in a delicate balancing of these determinations . . . by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*, citation omitted.)

Father contends the court abused its discretion in finding the first two elements but in concluding A.S. would not suffer detriment from the termination of her relationship with father by focusing on improper considerations like father's past struggles and the possibility that father might be able to maintain contact with A.S. with a postadoption contract.

*Caden C.* made clear that a permanency planning hearing "is decidedly not a contest of who would be the better custodial caregiver." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) A parent's continued "struggles with the issues that led to the dependency are 'relevant to the application of the [parental-benefit] exception' because it may be probative of whether interaction between parent and child has a negative effect on the child." (*In re D.M.* (2021) 71 Cal.App.5th 261, 270.)

As we already explained above, the juvenile court had handled this case for almost four years at the time of the permanency planning hearing in April 2021. The court was well informed of the issues father had confronted and the impact his inability to address those issues had on A.S. The court explained

15

that, while father had maintained a relationship with A.S. and loved her, "the reality [was] that that relationship has been kind of on-and-off depending on other things happening in the father's life." Despite father's efforts, he was "really unable to maintain his focus on the child as his priority" throughout the lengthy reunification period. We are not persuaded the court improperly used any factor in undertaking the "delicate balancing" *Caden C.* requires.

Father also suggests the court improperly relied on the possibility of a postadoption contract. The record does not support the conclusion the court considered this a factor in finding the exception to adoption did not apply. It appears plain the court was simply attempting to offer some words of comfort to father who expressed his upset with the court's decision to proceed with adoption.

## DISPOSITION

The April 9, 2021 order of the juvenile court denying father's petition pursuant to Welfare and Institutions Code section 388 is affirmed.

The April 9, 2021 order of the juvenile court terminating parental rights to the minor A.S. is affirmed.


GRIMES, Acting P. J.

WE CONCUR:


STRATTON, J.            WILEY, J.


16